NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-251

STATE OF LOUISIANA

VERSUS

EL JERICO JERMIAH BARTIE

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 26425-14
HONORABLE KENDRICK J. GUIDRY, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and D. Kent Savoie, Judges.

AFFIRMED;
REMANDED WITH INSTRUCTIONS.

Annette Fuller Roach
Louisiana Appellate Project
P. O. Box 6547
Lake Charles, LA 70606-6547
(337) 436-2900
COUNSEL FOR DEFENDANT-APPELLANT:
    El Jerico Jermiah Bartie

Stephen C. Dwight
District Attorney, Fourteenth Judicial District
John E. Turner
Assistant District Attorney
P. O. Box 3206
Lake Charles, LA 70601
(337) 437-3400
COUNSEL FOR STATE-APPELLEE:
    State of Louisiana

**PICKETT, Judge.**

## FACTS

On July 26, 2014, law enforcement attempted to arrest the defendant, El Jericho Jermiah Bartie, at the Super 8 in Sulphur, Louisiana, as a suspect in a pair of drive-by shootings that occurred a few days earlier. A standoff ensued during which the defendant fired numerous shots through the front door of his hotel room into a hallway containing seven law enforcement officers, and another shot through the back window of his motel room while an eighth officer was in the rear parking lot. The defendant eventually surrendered and was charged with eight counts of attempted first degree murder, one count for each of the officers present.

The defendant was indicted on October 16, 2014, on the charges of assault by drive-by shooting, a violation of La.R.S. 14:37.1; attempted second degree murder, a violation of La.R.S. 14:27 and 14:30.1; and the attempted first degree murder of seven individuals, a violation of La.R.S. 14:27 and 14:30. The state filed an amended bill of information on February 16, 2018, charging the defendant with assault by drive-by shooting, attempted second degree murder, and eight counts of attempted first degree murder. The state amended the bill of information again on February 22, 2018, reiterating the same charges but alleging the eight counts of attempted first degree murder were committed with the specific intent to kill more than one person.

On February 11, 2015, the defendant, through appointed counsel, filed a motion to waive his right to a jury trial. The trial court granted the motion on February 11, 2015, without a hearing.

Trial on the eight counts of attempted first degree murder began on March 5, 2018. The state severed the other counts at the beginning of trial.

The trial judge found the defendant guilty as charged on all eight counts. On April 30, 2018, the trial judge sentenced the defendant to the maximum sentence of fifty years at hard labor on each count, to run concurrently. Also, on April 30, 2018, the state filed a habitual offender bill of information seeking to enhance the defendant's sentence on the eighth count of attempted first degree murder. At a hearing on June 18, 2018, the trial judge found the defendant was "at least a fourth felony offender" and vacated the previously-imposed sentence of fifty years on the eighth count of attempted first degree murder. The trial judge then resentenced the defendant to the mandatory minimum sentence of fifty years at hard labor, without benefit of parole, probation, or suspension of sentence, and with credit for time served. The trial judge ordered the enhanced sentence to run concurrently with the other seven sentences.

On appeal, this court conditionally affirmed the defendant's conviction but remanded the case for determination of whether the defendant had validly waived his right to a jury trial. *State v. Bartie*, 18-913 (La.App. 3 Cir. 5/1/19) (unpublished opinion). After an evidentiary hearing on remand, the trial court found the defendant knowingly and intelligently waived his right to a jury trial. The defendant again appealed, contending the trial court erred in finding that he knowingly and voluntarily waived his right to a jury trial. This court agreed with the defendant, vacated the defendant's convictions, and remanded for a new trial. *State v. Bartie*, 19-497 (La.App. 3 Cir. 1/22/20), 289 So.3d 1106.

Jury selection for the defendant's second trial began on April 27, 2021. The defendant was found guilty as charged on all eight counts of attempted first degree murder on April 30, 2021. On June 21, 2021, the trial court again found the defendant to be a fourth or subsequent felony offender. The trial court then

2

imposed sentences of fifty years on each count, all to run concurrently and with credit for time served.

The defendant now appeals his convictions.

## ASSIGNMENTS OF ERROR

1.  The trial court erred in denying the Motion for Post Judgment of Acquittal or for a Responsive Verdict, or, in the alternative, Motion for New Trial as to counts nine, ten and eleven of the Amended Bill of Information (counts six, seven, and eight as presented to the jury) as the evidence introduced at the trial of this viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, was insufficient to prove beyond a reasonable doubt that Bartie had the specific intent to kill Kevin Jones, Lecia McCullough or Franklin Fondel.

2.  Counsel's performance fell below that guaranteed by the Sixth Amendment when she failed to object to the improper closing argument of the prosecution, resulting in prejudice to Appellant.

3.  The trial court violated Appellant's Fifth Amendment right to remain silent and his Fourteenth Amendment right to a fair trial at the retrial when it allowed the prosecution to introduce in its case-in-chief, the testimony of Appellant given in his first trial which was null, void, and of no effect due to a structural defect in those proceedings.

4.  The trial court erred in failing to redact references made by the state during the cross-examination of Appellant at the first trial to other crime/bad acts when no evidence was admitted at the retrial to support the statement.

5.  The trial court erred in accepting and giving the state's requested jury charge that specific intent to kill may be inferred from the act of pointing a gun and firing at a person in close proximity.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there is an error in the commitment order that requires correction. The defendant was convicted of and sentenced on eight counts of attempted second degree murder as a fourth habitual offender with the sentence on each count to run concurrently. The commitment order reflects that the defendant was convicted of a

3

single count of attempted first degree murder rather than eight counts. Accordingly, the trial court is ordered to correct the commitment order to accurately reflect the number of counts of which the defendant was convicted and for which he was sentenced. *See State v. Walls*, 18-730 (La.App. 3 Cir. 3/7/19), 270 So.3d 701; *State v. Wade,* 20-299 (La. 7/31/20), 300 So.3d 389.

## DISCUSSION

The state's first witness was retired Lieutenant Charles Welch of the Lake Charles Police Department. Lieutenant Welch testified that in July of 2014 he was the commander of the SWAT (Special Weapons and Tactics) team as well as a commander of the K9 and training divisions. According to Lieutenant Welch, he was contacted on July 26, 2014, by Corporals George Miller and Mayo Romero who informed him they believed they had located the defendant. After surveilling the motel for some time, Corporal Romero saw who he believed to be a woman related to the defendant exit the motel but she returned before the officers could make contact. Lieutenant Welch testified he then spoke to the manager of the motel to inquire whether the defendant was present, using a photograph of the defendant and his significant other that Lieutenant Welch had received from Corporal Miller.

Lieutenant Welch testified the manager could not confirm the couple's presence but stated he had two individuals in a room that he believed might be the couple. The manager noted he was headed to their room to see if he could help them with a television issue. Upon returning from the room, the manager confirmed the couple depicted in the photos was in fact the individuals in the room. According to Lieutenant Welch, he then contacted the Sulphur Police Department and the detectives involved in the case for which the defendant was wanted, and requested backup. He also testified that he had a K9 unit, Officer Kevin Jones,

4

positioned on the back side of the motel to ensure the defendant did not try to escape through the window.

Lieutenant Welch was asked to describe the term "stack" in reference to SWAT operations. He testified that in a stack you have between two and four officers bunched together, each with a different assignment when entering a room or building. Lieutenant Welch noted he was not part of a stack in the instant case as he was the supervising officer. Lieutenant Welch testified he believed two shots were fired out of the back window of the hotel room.

On cross-examination, Lieutenant Welch testified that shortly after the motel manager confirmed the people in the room were the couple in the photo, the manager returned and informed him the couple were about to check out of the room. He also noted the officers in the stacks were operating with their bodies pressed up against each other to minimize the need for verbal communication, and to partially obscure their movements from the people inside the room.

The state then called Mr. Pintu "Peter" Patel, the manager of the Super 8 motel in Sulphur, Louisiana. Mr. Patel confirmed the photograph previously shown to Lieutenant Welch was the photograph shown to him on July 26, 2014. Mr. Patel testified the woman in the photograph checked into the room and the defendant entered the back of the motel and met her in the room. Mr. Patel testified he also saw the defendant when he went to their room in order to check on an issue with a circuit breaker. He noted the room was under the name Jessica Bartie, the defendant's sister. Mr. Patel testified he hid in his back office when he heard gunshots and saw officers on either side of the door via surveillance cameras while shots were coming through the door.

On cross-examination, Mr. Patel testified the cameras do not record audio. He noted there were cameras in the lobby, breakfast area, three in the hallway, and

one facing the back entrance. Mr. Patel noted the back door did not lock or require a key card.

After the state announced its intention to possibly introduce the defendant's testimony from his initial trial during its case in chief, the state called Sergeant George Miller of the Lake Charles Police Department. Sergeant Miller testified he has been assigned to the SWAT team full time since 2011. He noted that he is commissioned as both a Lake Charles Police Officer and a Calcasieu Parish Sheriff's deputy, allowing him jurisdiction throughout Calcasieu Parish. Sergeant Miller stated he became involved with the current case when Detective Lecia McCullough of the Lake Charles Police Department contacted him and Sergeant Romero regarding the location of the defendant. According to Sergeant Miller, he and Sergeant Romero were both informed by Detective McCullough that the defendant may be at the Super 8 in Sulphur on July 26, 2014. Sergeant Miller testified he and Sergeant Romero then contacted Lieutenant Welch and two other officers to meet them in Westlake before proceeding to the Super 8.

Sergeant Miller testified they set up a perimeter in the Super 8 parking lot and began trying to identify any vehicles or individuals known to be associated with the defendant, with Sergeant Romero eventually spotting Ms. Katie Mancil, the defendant's significant other. He testified Lieutenant Welch confirmed the location of Ms. Mancil's room with hotel management, noting it was the room closest to the west side entrance. Sergeant Miller testified they wanted to confront the defendant and Ms. Mancil while they were in the room to avoid a potential increase in danger to the public.

Sergeant Miller testified the plan was to enter the motel from the west entrance, split into two stacks on opposite sides of the door to the room, then use a keycard obtained from motel management to open the door. Sergeant Miller stated

6

they opted to use a key card in the hopes of avoiding having to fight the defendant. Although the key card unlocked the door, the secondary latch caught, preventing law enforcement from entering the room quickly or quietly. Sergeant Miller testified the door quickly slammed shut and the deadbolt was locked. According to Sergeant Miller, both he and Officer Manuel then announced their presence loudly before Sergeant Miller tried to evacuate the family in room 122, which was directly across from the defendant's room, room 127. Sergeant Miller then returned to his position on the side of room 127's door. At that point, five rounds came through the door of 127 in rapid succession.

Testifying that he was right next to the door frame of room 127, Sergeant Miller noted the rounds fired through the door were close enough to him that he "had shrapnel hit [him] in the face." According to Sergeant Miller, he and Corporal Loving were on the left side of the door, so close they were almost touching each other. He again stated the shots began within seconds of his knocking on the door to room 122. Sergeant Miller testified the stack on the opposite side of the door was Sergeant Romero, Sergeant Sawyer, Officer Michael Manuel, with Detectives Lecia McCullough and Franklin Fondel "a little further back," along with a Sulphur police officer Corporal Fairchild. Sergeant Miller stated there were times during the confrontation when the detectives "were within feet" of the officers on the right side of the door.

According to Sergeant Miller, when the first volley of shots came through the door he yelled "shots fired" and immediately began backing away from the door while checking to confirm he had not been shot. Sergeant Miller testified Corporal Loving spoke to the individual in room 118 and obtained the room for use as cover in the event the defendant entered the hallway to engage law enforcement. He stated both he and Corporal Loving maintained a visual on room

7

127 and kept their guns trained on the door to said room. Sergeant Miller testified that Corporal Lofton climbed into room 118 through the window to assist them. According to Sergeant Miller, the standoff with the defendant lasted about thirty minutes, during which time additional shots were fired through the door of room 127. Sergeant Miller testified that during the standoff he heard what sounded like the defendant reloading his weapon inside room 127.

According to Sergeant Miller, Sergeant Romero attempted to communicate with the defendant during the standoff. Sergeant Miller testified that as they were speaking, the defendant's voice became less distinct and a shot was ultimately fired near Sergeant Romero, leading Sergeant Miller to believe the defendant was speaking with Sergeant Romero so that he could pinpoint Sergeant Romero's location and shoot at him. Sergeant Miller testified there was a small foyer at the end of the hallway where room 127 was the last room, and that Detectives Fondel and McCullough were in the foyer area at times during the standoff. He also testified that Sergeant Sawyer's microphone was on and recorded the audio from the standoff. The state then introduced State's Exhibit 2, a video wherein motel security footage, which has no audio, is played in sync with the audio and video from Sergeant Sawyer.

Sergeant Miller confirmed that when the initial shots were fired through the door of room 127, Sergeants Romero and Sawyer, along with Officer Manuel, were in a stack on the opposite side of the door with Detectives Fondel and McCullough behind them "in the corridor." He also testified that he and the other officers were able to hear things that were not picked up by Sergeant Sawyer's microphone.

Sergeant Miller testified on cross-examination that law enforcement did not have body cameras at the time of the incident, only audio and in-car video. Noting

his car did not have the ability to record audio and video, Sergeant Miller clarified the audio came from Sergeant Sawyer's microphone which was on his person. He also clarified that when he heard the defendant's weapon being racked, it could mean either the defendant was dislodging a nonfunctional bullet, or he could have been reloading the weapon. Sergeant Miller testified that after the initial five-round volley came through the door, he heard a sixth shot inside the room. Then, three more rounds came through the door. After that, he heard multiple gunshots within the room. Finally, a single round exited the wall in the direction of Sergeant Romero, Sergeant Sawyer, and Sergeant Manuel near the side exit.

The state then called Sergeant William Loving, a detective with the Lake Charles Police Department who in 2014 was a corporal in the patrol division and part-time SWAT team member. Sergeant Loving testified that during the attempt to enter the defendant's room and subsequent standoff, he was paired with Sergeant Miller on the left side of the door while Sergeants Romero and Sawyer were on the right along with Officer Manuel. He testified Sergeant Miller used a keycard to unlock the door to the defendant's hotel room but the top latch prevented the door from opening. It was slammed shut, then Sergeant Miller and Officer Manuel loudly announced that it was the Lake Charles Police Department trying to enter the room. Sergeant Loving corroborated Sergeant Miller's testimony that Sergeant Miller attempted to remove the inhabitants of the room across the hall from the defendant's room, returned to the doorway by Sergeant Loving, then the first volley of rounds came through the front door. Sergeant Loving estimated the first rounds came through the door within a minute of Sergeant Miller knocking on the door across the hall. Sergeant Loving testified they tried to take cover in room 120 but no one answered the door. They moved

down to room 118 where they were able to send the occupants to the motel lobby and use the threshold for cover.

Sergeant Loving testified that neither he nor any other officer fired their weapons as they "don't take chances." He also noted that Sergeant Lofton, who entered room 118 and assisted Sergeants Loving and Miller, was easily identifiable as a law enforcement officer as he was wearing a patrol uniform. Sergeant Loving confirmed on cross-examination that he was wearing a radio and that other people would be able to hear it.

The state then called Sergeant Mayo "Joey" Romero of the Lake Charles Police Department. Sergeant Romero testified he has been a SWAT operator for the department for fourteen years and noted he was a full-time SWAT operator in 2014. Sergeant Romero corroborated Sergeant Miller's description of events leading up to the attempt to enter room 127 with a key card obtained from the motel manager. He confirmed the two-man stack was Sergeants Miller and Loving and that the three-man stack was himself, Sergeant Sawyer, then Officer Manuel. According to Sergeant Romero, Detectives Fondel and McCullough were "a few feet behind" his stack when Sergeant Miller attempted to open the door to room 127.

According to Sergeant Romero, his stack had already backed down the hall about ten feet to block anyone from exiting the stairwell at the end of the hall when the first volley of shots came through the door of room 127. Sergeant Romero testified he attempted to engage the defendant in conversation after he heard the defendant begin to accuse Ms. Mancil of setting him up and turning him in to law enforcement. Sergeant Romero stated he and other officers felt the defendant was trying to gauge Sergeant Romero's location during the conversation, which ultimately ended when a bullet was fired through a wall in his direction.

10

The state then called Sergeant Mitchell Sawyer of the Lake Charles Police Department who testified that in 2014 he was a part-time SWAT team leader and a K9 handler. Sergeant Sawyer testified that when he arrived at the Super 8, he met with Sergeant Jones, Lieutenant Welch, and a Sulphur law enforcement officer. According to Sergeant Sawyer, he was armed with both a handgun and a semi-automatic shotgun throughout the ordeal, noting he was the second person in Sergeant Romero's stack on the right side of the door to room 127. Sergeant Sawyer stated the initial plan was to breach the door and call the defendant out once they were into the hotel room with a contingency plan of treating it as a barricaded subject situation if they were unable to breach the room. Accordingly, his stack began backing away from the door as soon as it slammed shut, stating the first volley of shots came through the door within seconds of the attempt to breach it. It was noted Sergeant Sawyer was farther from the door of the defendant's room than Sergeants Miller, Romero, and Loving, and that part of the audio was recorded while he was outside the hotel.

The state's next witness was Officer Michael Manuel of the Rockwall Police Department in Texas. Officer Manuel testified that on July 26, 2014, he was a full-time patrol officer and part-time SWAT operator for the Lake Charles Police Department. Officer Manuel testified he was the third member of Sergeant's Romero's stack on the right side of the door. Officer Manuel testified that after the first volley of rounds, he moved closer to the stairwell to make sure no one came out of the stairwell. He also stated they heard several more shots fired while they were in the foyer area of the hallway by the exit before they took up positions outside.

The state then called Sergeant Kevin Jones, the K9 supervisor and field training coordinator for the Lake Charles Police Department. Sergeant Jones

testified he was in his twenty-eighth year with the department. According to Sergeant Jones, on July 26, 2014, he was at home off duty when Lieutenant Welch contacted him about locating the defendant and requesting a K9 officer. Sergeant Jones testified he and his K9 partner approached the exit nearest room 127 from the back parking lot. Upon his approach, he noticed a silhouette in the target window and took cover behind a pickup truck. Sergeant Jones testified he was unsure what was going on inside the motel at that time. Sergeant Jones clarified he was watching the window so that he could send his partner after the defendant in the event the defendant attempted to flee the motel through the window.

Sergeant Jones testified he heard yelling regarding shooting but could not get confirmation on who was shooting because his radio's battery was dead. He stated he then saw glass spray from the windshield of a vehicle directly across from the defendant's window. Sergeant Jones stated he "was a distance away" from the car that was shot but that he had been heading that way before seeing a silhouette in the window.

On cross-examination, Sergeant Jones acknowledged that he did not see the curtains move inside the room; he merely saw a silhouette of a person near the window. He agreed the window was around thirty to fifty feet away from Sergeant Jones's position when he saw the silhouette. Sergeant Jones could not explain why video showed him, after seeing the silhouette in the window, advancing past a black truck behind which he had taken cover then returning to cover behind the truck. Sergeant Jones then stated, "it appeared they were peaking [sic] out the corner between the blind and the wall," but acknowledged he never actually saw anyone, only a silhouette.

The state then called Deputy Chief Franklin Fondel of the Lake Charles Police Department. Deputy Chief Fondel noted that prior to his current

12

assignment, he was a sergeant in violent crimes in the detective division. He testified that on July 26, 2014, he was working as a detective on an investigation with Lieutenant Lecia McCullough. After Lieutenant McCullough obtained information which led to the defendant being located at the Super 8 motel, Deputy Chief Fondel and Lieutenant McCullough rode together to the motel in Sulphur to execute an arrest warrant for the defendant. After confirming the defendant was in room 127, Deputy Chief Fondel noted he and Lieutenant McCullough joined several SWAT officers and Officer Fairchild of the Sulphur Police Department and approached the door to said room via the entrance at the end of the hallway closest to the room.

After the initial volley of shots came through the door, Deputy Chief Fondel testified he ended up outside the motel with Lieutenant McCullough just inside the door, although he noted they switched places at some point. He testified the standoff ended at approximately 9:04 p.m. when the defendant exited the room and surrendered to Sergeant Romero. Deputy Chief Fondel advised him of his *Miranda* rights at that time, both he and Lieutenant McCullough entered the hotel room to check on the defendant's wife, then called an ambulance after noting she had a gunshot wound to her upper left leg.

On cross-examination, Deputy Chief Fondel stated he and Lieutenant McCullough were in the foyer area near the exit, peeking around the edge of the wall, when the first gunshots were fired. He then acknowledged they remained well clear of the room until after the defendant surrendered.

The state then called Lieutenant Lecia McCullough of the Lake Charles Police Department, who noted she was a sergeant and violent crimes detective at the time of the standoff with the defendant. Lieutenant McCullough testified she went to both the defendant's last known address and his mother's last known

13

address after obtaining an arrest warrant, noting she spoke to the defendant's wife, Katie Mancil, at the defendant's last known address. According to Lieutenant McCullough, she informed Ms. Mancil they had a warrant for the defendant's arrest, that she needed to inform law enforcement if she spoke to the defendant, and that she would be arrested if she were found with the defendant when law enforcement located him.

According to Lieutenant McCullough, she had Sergeants Miller and Romero begin surveillance on the Super 8 after obtaining the defendant's phone records and seeing the Super 8 had been called four times. Lieutenant McCullough testified she and Deputy Chief Fondel remained in the foyer area by the exit while the five SWAT operators approached the door to room 127 to try and arrest the defendant. She testified they retreated outside the motel after the first round of shots. She confirmed on cross-examination that she did not advance around the corner of the foyer by the exit.

The state then called Sergeant John Lofton of the Lake Charles Police Department. Sergeant Lofton testified that while he was an assistant SWAT team leader in July of 2014, he was on patrol on the day of July 26, 2014. Sergeant Lofton testified he was in North Lake Charles when he was informed some of the SWAT team was in Sulphur, had someone barricaded in a room at the Super 8 Motel, and that shots had been fired. He put on his lights and siren and proceeded to the Super 8 in Sulphur. He testified Lieutenant Welch instructed him to meet up with Sergeants Loving and Miller in room 118, which he accomplished by entering room 118 from the outside through the window.

According to Sergeant Lofton, after the defendant fired rounds through the walls of his hotel room multiple times, he eventually yelled that he wanted to surrender. Sergeant Lofton testified that he engaged the defendant in conversation,

14

informing him that he had to throw out his guns and exit the room with his hands up if he wanted to surrender while the defendant repeatedly insisted that they come into the room to get him. The defendant initially threw a ballistic vest into the hallway, then subsequently threw two guns and his wristwatch into the hallway before finally exiting the room with his hands above his head. Sergeant Lofton testified he and multiple other officers then entered the room and observed Ms. Mancil in the bathroom holding pressure on a gunshot wound to one of her legs.

Following Sergeant Lofton's testimony, the trial court informed the attorneys, outside the presence of the jury, that it would allow "redacted prior trial testimony to be admitted" in the state's case-in-chief. The trial court explained that its ruling was based on *State v. Parker*, 436 So.2d 495 (La.1983), and *State v. Graves*, 96-1537 (La.App. 4 Cir. 9/10/97), 699 So.2d 903. The court also explicitly instructed the attorneys not to say the testimony was from a prior trial but to instead describe it as testimony from a "prior hearing in connection with this case."

The state then called Officer Natalie Hanson, an evidence officer for the Sulphur Police Department. Officer Hanson introduced State's Exhibit 12, a walkthrough video of the crime scene. Officer Hanson then explained what was in each of State's Exhibits 13 through 62, photographs of the crime scene and Ms. Mancil's injury. Additionally, she noted that although there were two holes in the window of room 127, only one projectile was recovered from a truck directly across from the window. She surmised the other projectile may have gone over the cars and landed in the large empty field behind the motel.

According to Officer Hanson, they recovered eighteen different shell casings at the scene. She also identified twelve live rounds and seventeen projectiles recovered from the scene. She then identified the two firearms recovered from the

15

hallway of the motel, a pink Cobra handgun and a silver and black Davis Industries handgun. Officer Hanson then identified the bullet-proof vest recovered from the hallway. She also testified there were eleven bullet holes in the door to room 127.

Officer Hanson noted the curtains inside the room were closed in photographs and confirmed they were closed when she arrived at the scene. She also noted you could not see through the curtains when they were closed. Officer Hanson testified they found five cellphones in the motel room, four on the bed and one in the bathroom. She acknowledged, however, that she was unaware which, if any, phones were operational. Officer Hanson noted there were holes in the curtains which would correspond to the location of the bullet holes in the window if the bullets had been fired while the curtains were closed. She again acknowledged that, if the curtains had been closed, someone inside the room would have been unable to see outside the room.

Following a lengthy discussion of issues regarding both jury instructions and redactions made to the transcript of the defendant's testimony at his previous trial, the state called Ms. Michelle Cazes of the Louisiana State Police Crime Laboratory. Ms. Cazes was accepted without objection as an expert in firearms analysis. Ms. Cazes noted that the Davis Industries .380 gun which was submitted for analysis was inoperable upon receipt as the firing pin was broken. She also testified that the sixteen bullets submitted to the lab were all determined to have been fired from the .380 pink Cobra handgun. Additionally, she testified the eighteen recovered cartridge casings were all fired from the same Cobra handgun.

Ms. Cazes testified that, while test-firing the Cobra handgun, the gun had to be disassembled and cleaned before it would fire properly. Even then, she noted the rounds casings had to be manually ejected due to a weak extractor spring. According to Ms. Cazes, a number of the live rounds provided to the crime lab

from the crime scene had "shallow firing pin impressions" identical to her first attempt to fire the weapon, prior to cleaning and reassembling it. Ms. Cazes testified four of the live rounds indicated someone had tried to fire them with the Cobra handgun, including one round that someone tried to fire twice. On cross-examination, Ms. Cazes noted the Cobra's magazine held seven rounds.

The state then admitted State's exhibit 65A, a redacted transcript of the defendant's testimony at the prior bench trial. The transcript was read into the record with Ms. Brittany Chavis reading the questions asked by defense counsel, Assistant District Attorney Jacob Johnson reading the questions asked by the prosecution, and a Mr. George Miller reading the defendant's answers and testimony.

*TRANSCRIPT OF DEFENDANT'S PRIOR TESTIMONY*

The defendant claimed he asked his sister to get him a room at the Super 8 in her name. He stated he never entered the motel through the front entrance and noted that when he went to the vending machines in the hallway, he wore a towel over his head so his face was not seen by the surveillance cameras. The defendant testified that he was taking drugs, including marijuana laced with PCP. He also took cocaine, Xanax, and other prescription drugs. The defendant stated he did not have much experience with guns. He stated that he only had them because he was "fearing for [his] life." He stated he did not hear law enforcement identify themselves.

According to the defendant, he did not expect anyone to be standing in front of the door when he fired multiple rounds through the door, he did not expect anyone to be near the bullet that was fired out of the window, and he claimed he never went near the window. Testifying that he and Ms. Mancil took cover in the

17

bathroom, the defendant claimed he never heard any police radio. He reiterated that he was not aiming at anyone when he was shooting out of the door.

On cross-examination, the defendant denied engaging in conversation with any of the law enforcement officers. He insinuated that him firing shots every time law enforcement was heard talking on the video was simply coincidence. He continued to maintain that he did not speak with law enforcement during the standoff. He claimed he did not know the name of a single person from whom he bought drugs. The defendant testified he did not know there was an arrest warrant out for him, despite law enforcement having contacted his sister, sister-in-law, brother-in-law, mother, and wife while trying to locate him.

The defendant continued to maintain that he did not hear law enforcement announce themselves, either before or after attempting to open the door. Despite claiming that common sense said it had to be law enforcement outside the room, the defendant contended he had no idea he was shooting at law enforcement until after he threw his jacket and guns outside the room, when he saw at least two of the officers. According to the defendant, he and Ms. Mancil agreed that he would shoot her so that he would go to jail and she would go to the hospital. He also claimed he had no idea law enforcement had spoken to her about there being an arrest warrant out for him. The defendant continued to maintain he was not trying to hit anyone when he kept firing rounds through the door, walls, and window. He stated he was merely trying to discourage anyone from coming in after him. The defendant stated he did not remember ever looking out of the window. The state then published its evidence to the jury and rested its case.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, the defendant contends the trial court erred in denying his "Motion for Post Judgment of Acquittal or for a Responsive Verdict,

18

or, in the Alternative, Motion for New Trial," which contended the state failed to prove the defendant had the specific intent to kill any of the eight officers he was convicted of trying to murder. At a May 14, 2021 hearing, the trial court found the defendant's act of firing five rounds through the front door was sufficient to justify a jury finding specific intent to kill with regard to the five officers stacked near the door. Although the trial court stated it may have reached a different conclusion regarding Deputy Chief Franklin Fondel, Lieutenant Lecia McCullough, and Sergeant Kevin Jones, the court nonetheless denied the motion.

Although the defendant frames the assignment of error as contending the trial court should have granted the post-verdict motion, he actually argues that there was insufficient evidence to support his convictions for the attempted murders of Deputy Chief Fondel, Lieutenant McCullough, and Sergeant Jones. This is evidenced by the fact the defendant defines and argues the standard of review for an appellate claim of insufficient evidence, not the standard for a motion for post-judgment verdict of acquittal or a motion for new trial. Accordingly, we will address this assignment of error as a claim of insufficient evidence regarding the three counts of attempted first degree murder of Deputy Chief Fondel, Lieutenant McCullough, and Sergeant Jones.

The analysis for insufficient-evidence claims is well-settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*,

436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

In the instant case, the only element of attempted first degree murder the defendant contests is whether the state proved he had the specific intent to kill necessary for an attempted murder conviction as it relates to Deputy Chief Fondel, Lieutenant McCullough, and Sergeant Jones.

To obtain a conviction for attempted first degree murder, the state must prove that the defendant had the specific intent to kill the victim, that the victim was a police officer engaged in the performance of his lawful duties, and that the defendant performed an act for the purpose of and tending directly toward the accomplishment of the offense intended. La.R.S. 14:27; La.R.S. 14:30; *State v. Turner*, 626 So.2d 890 (La.App. 3 Cir. 1993), *writ denied*, 93-3182 (La. 4/4/94), 635 So.2d 1122. "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific criminal intent can be formed in an instant. *State v. Johnson*, 21-403 (La.App. 3 Cir. 2/23/22), 335 So.3d 930. "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Bishop*, 01-2548, p. 4 (La. 1/14/03), 835 So.2d 434, 437. "Specific intent to kill may also be inferred from a defendant's act of pointing a gun and firing at a person." *State v. Reed*, 14-1980, p. 21 (La. 9/7/16), 200 So.3d 291, 309, *cert. denied*, ___ U.S. ___, 137 S.Ct. 787 (2017). "The fact that multiple shots are fired at a victim indicates a defendant's culpable state of mind and satisfies the specific intent to kill requirement for murder." *State v. Poullard*, 03-940, p. 21

20

(La.App. 3 Cir. 12/31/03), 863 So.2d 702, 718, *writ denied*, 04-908 (La. 3/18/05), 896 So.2d 995. "The determination of whether the requisite intent is present in a criminal case is for the trier of fact[.]" *State v. Evans*, 98-1850, p. 3 (La.App. 3 Cir. 5/5/99), 734 So.2d 866, 869, *writ denied*, 99-1616 (La. 12/17/99), 751 So.2d 871.

As noted, the defendant does not contest that he is the individual who was firing bullets through the walls and door of room 127 while law enforcement was in the hallway. He contests only that the state failed to prove his intent to kill two detectives who he argues were not in the hallway proper, and a K9 officer who was in the parking lot behind room 127's window, but roughly forty feet away when two shots were fired out of said window. While the defendant acknowledges that pointing a gun at someone and firing the gun can be indicative of specific intent to kill, he contends "a gun was not pointed or aimed directly at anyone." The state's argument is essentially that his actions indicated specific intent to kill all eight officers, or his intent to kill the five by the door should be "transferred" to the other officers. There is no basis for "transferred intent" in the instant case. As the fourth circuit has previously stated:

> The doctrine of transferred intent provides that "[w]hen a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or inflicting of great bodily harm would have been unlawful against the intended victim actually intended to be shot, then it would be unlawful against the person actually shot, even though that person was not the intended victim." *State v. Strogen,* 35,871, p. 4 (La.App. 2 Cir. 4/3/02), 814 So.2d 725, 728 (citing *State v. Jasper,* 28,187, p. 18 (La.App. 2 Cir. 6/26/96), 677 So.2d 553, 566–67).

*State v. Ross*, 12-109, pp. 8-9 (La.App. 4 Cir. 4/17/13), 115 So.3d 616, 621 (alteration in original), *writ denied*, 13-1079 (La. 11/22/13), 126 So.3d 476.

21

Given that none of the officers were actually shot during the standoff, it is impossible to establish the defendant's specific intent through the doctrine of transferred intent. Given the fact the jury was instructed that "[t]he specific intent to kill may be inferred from the act of pointing a gun and firing at a person in close proximity," the question of the defendant's specific intent to kill Deputy Chief Fondel, Lieutenant McCullough, and Sergeant Jones turns on whether the state proved the defendant pointed a gun and fired at the three officers while "in close proximity."

According to both Deputy Chief Fondel and Lieutenant McCullough, when the defendant started shooting, both of them were behind the corner of the hallway in the foyer directly inside the west entrance to the motel, which is immediately adjacent to the defendant's room. They subsequently retreated outside of the motel following the first volley of shots. The video supports that testimony. The evidence establishes the defendant was firing through the door and walls with no visual on any particular officer who might have been outside. The testimony establishes, supported by the video, that Deputy Chief Fondel and Lieutenant McCollough were feet from his room. The shots went through both doors and walls adjacent to his room. He could not know, specifically, who was in his direct line of fire. The evidence supports a finding that he was firing 'blindly' in an attempt to kill the officers on the scene. The fact that none were in his direct line of fire, evidenced by the fact none were hit, does not negate the fact that he had a specific intent to kill those who were there to arrest him. "

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; **and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.**

La.R.S. 14:27(A) (emphasis added). In a light viewed in a light most favorable to the prosecution, the evidence supports a finding by the jury that he had the specific intent to kill all officers within range, including Deputy Chief Fondel and Lieutenant McCollough.

Regarding the defendant's conviction for the attempted murder of Sergeant Jones, two shots were fired out of the motel room window toward the back parking lot, where Sergeant Jones was located. The evidence suggesting the defendant knew someone was in the back parking lot was Sergeant Jones's testimony that he saw a silhouette in the defendant's room, from his position roughly forty feet away from the window, through the curtains. It appeared to him someone was looking out between the blinds and the window. One of the bullets fired through the window struck a vehicle directly behind the window, roughly forty feet from where Sergeant Jones was taking cover. The other bullet was never recovered. Again, the defendant was firing blindly through the window. Viewing the evidence in the light most favorable to the prosecution, accepting Sergeant Jones's claim that he saw someone near the window, and considering he fired two shots through the window into the parking lot where the officer was stationed, together with his other actions, the evidence supports a finding by the jury that the defendant had a specific intent to kill any officer stationed outside his window assisting in the attempt to arrest him.

When viewed in a light most favorable to the prosecution, we find there is sufficient evidence to support a finding that the defendant had specific intent to kill Chief Franklin Fondel, Lieutenant Leia McCullough, and Sergeant Kevin Jones. This assignment of error is without merit.

23

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, the defendant contends he received ineffective assistance of counsel when counsel "failed to object to the improper closing argument of the prosecution, resulting in prejudice to Appellant." The defendant's argument is, in essence, that counsel was ineffective for failing to object to the state's comments on what everyone believed and on the validity of the witness testimony during its closing argument. An ineffective assistance of counsel claim requires a defendant to satisfy a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984).

The state contends the comments were not improper so there was no deficient performance by defense counsel. We agree with the state. We have reviewed both the state's closing argument and its rebuttal argument. We find no improper argument made by the prosecutor in this matter. Consequently, as there was no legitimate objection to make, defense counsel's performance cannot be considered deficient. This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER THREE

In his third assignment of error, the defendant contends the trial court violated his rights against self-incrimination and his right to a fair trial when it allowed the state to introduce, during its case-in-chief, the defendant's testimony from the previously vacated bench trial in this matter. As recognized by the

defendant in brief, the trial court's allowance of the testimony was predicated on

*State v. Parker*, 436 So.2d 495, 498-99 (La.1983), which held:

> In *State v. Reed,* 324 So.2d 373 (La.1975), this court applied the long-standing federal rule in this area that a defendant in a criminal case who takes the stand in his own behalf and testifies without asserting his privilege against self-incrimination thereby waives the privilege as to the testimony given so that it may be used against him in a subsequent trial of the same case. *Id.* at 380. See, *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); *United States v. Bohle,* 475 F.2d 872 (2nd Cir.1973); *Edmonds v. United States,* 106 U.S.App.D.C. 373, 273 F.2d 108 (1959), cert. denied, 362 U.S. 977, 80 S.Ct. 1062, 4 L.Ed.2d 1012. Not only is this the federal rule, but numerous other states have also provided that when a defendant testifies at a first trial but not at the second, his prior testimony may be used against him.  See, e.g. *State v. Norwood,* 217 Kan. 150, 535 P.2d 996 (1975); *State v. Slone,* 45 Ohio App.2d 24, 74 Ohio Ops.2d 66, 340 N.E.2d 413 (1975); *Chavez v. State,* 508 S.W.2d 384 (Tex.Cr.App.1974); *Harbaugh v. Commonwealth,* 209 Va. 695, 167 S.E.2d 329 (1969). See generally, Cook; Constitutional Rights of the Accused—Trial Rights, § 66 (1974). Therefore, the introduction of the transcript did not violate defendant's privilege against self-incrimination.

The defendant contends, however, that *Parker* and subsequent cases citing it are distinguishable from the case sub judice because they were the results of mistrials, whereas the defendant's first trial was vacated for a structural error and therefore the prior trial was null and void.  The defendant's argument that his invalid waiver of his right to a jury trial was a structural error, however, ignores the plain language of this court's ruling that vacated his conviction.  There, this court stated that:

> As noted in *State v. Holder*, 50,171, p. 29 (La.App. 2 Cir. 12/9/15), 181 So.3d 918, 934, "Any error with respect to defendant's jury trial waiver is merely a waivable trial error and not a non-waivable structural defect." Accordingly, we will first examine the "harmless error" standard of appellate review.

*Bartie*, 289 So.3d at 1121.

The defendant's entire basis for distinguishing his case from *Parker* is predicated on an assumption that this court has already dispelled.  Rather than

addressing that fact, the defendant instead concludes his trial was vacated because of a structural defect and contends that distinction entitles him to a new trial. Accordingly, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

In his fourth assignment of error, the defendant contends the trial court erred in failing to redact comments made by the state during the defendant's first trial because it related to "other crimes evidence." The comments in question occurred during the following exchange wherein the prosecutor questioned the defendant's claim that he was not trying to shoot anyone:

> **Q.** They drop a keycard into the door, you're standing in front of the door, bullets come through; what are they gonna do? They're going to hit somebody, are they not?
>
> **A.** If they're in front of the door.
>
> **Q.** *If they're in front of the door. But you don't know where they are. Suppose that had been a little kid that was in Room 122 who opened the wrong door, was that an appropriate response - - who, by the way - - I'm sorry, you didn't answer; do you have an answer?*
>
> **A.** *I was just letting you talk.*
>
> **Q.** *All right. Who, by the way, was standing at this door when she heard the bullets coming through it and thought it was her daddy knocking on the door and bullets flying over her head - - and has bullets flying over her head?*
>
> **A.** *That's what happened?*
>
> **Q.** *Yes, that's what happened.*
>
> **A.** *So a bullet flew over a - - flew a little girl's head when nobody said that?*
>
> **Q.** Several of them did.
>
> **A.** Oh.

The defendant contends this highlighted passage should have been removed because it was other crimes evidence which was not admitted through other

witnesses during the state's case-in-chief. As noted in brief, counsel's objection to the inclusion of the passage during trial was premised on there having been testimony that a family was in room 122. There was no evidence in this trial establishing a child was in the room at the time of the shooting. The state argued during trial, and the court agreed, that it was clear from the photographs and video that room 122 was occupied. Sergeant Miller testified he had knocked on the door of 122 to try and evacuate the family. The bullets in question are the same bullets the defendant fired through the door of room 127, some of which subsequently went through the door and wall of room 122.

This assignment of error lacks merit. The defendant has failed to cite a single piece of jurisprudence to support his contention that this passage should have been removed. Furthermore, as argued by the state at trial, this is not a separate incident that is being discussed. The story involves the same bullets, incontestably fired by the defendant, which are the basis for the defendant's convictions.

### ASSIGNMENT OF ERROR NUMBER FIVE

In his fifth and final assignment of error, the defendant contends the trial court erred when it included a jury instruction requested by the state regarding specific intent. The jury instruction at issue stated, "The specific intent to kill may be inferred from the act of pointing a gun and firing at a person in close proximity." The state requested the instruction based upon *State v. Lewis*, 09-1404 (La. 10/22/10), 48 So.3d 1073; *State v. Tassin*, 536 So.2d 402 (La.1988), *cert. denied*, 493 U.S. 874, 110 S.Ct. 205 (1989), and *State v. Noble*, 425 So.2d 734 (La.1983).

Although trial counsel sought to have "at point-blank range" added to the instruction while contending that was the language from several of the cases

discussed, the language in *Lewis* is clear, "[i]n that regard, the court of appeal followed settled jurisprudence that specific intent to kill may be inferred from the act of pointing a gun and firing at a person in close proximity." 48 So.3d at 1076. In *Tassin*, the court stated, "A specific intent to kill can be inferred from someone pointing a gun at close range and pulling the trigger." 536 So.2d at 411. Likewise, in *Noble*, the court stated, "It can be inferred from the fact that the defendant shot the victim in the head from close range that he actively desired his death to follow." 425 So.2d at 736. The jury instruction was an accurate and correct rule of law.

The defendant also contends the instruction was improper because the trial court found that "close proximity" was an argument to be made to the jury. This argument is based upon this court's language in *State v. Rodgers*, 21-190, p. 2 (La.App. 3 Cir. 4/14/21), 318 So.3d 315, 317 (altreations in original), *writ denied*, 21-675 (La. 9/27/21), 324 So.3d 87:

> Louisiana Code of Criminal Procedure Article 802(1) requires that the trial court in criminal cases charge the jury "[a]s to the law applicable to the case[.]" Louisiana Code of Criminal Procedure Article 807 gives to the state and the defendant "the right before argument to submit to the court special written charges for the jury" but specifically provides that "[a] requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given." The language "shall" within the statute connotes that it is a mandatory requirement of the trial court, but only when the requested charge is "wholly correct" and not in need of further "qualification" or "explanation." *Id.*

Thus, the defendant contends the need to discuss what constitutes "close proximity" in the instant case means the trial court should not have given the instruction. The defendant's interpretation of this court's language goes beyond the actual language, as well as the language of La.Code Crim.P. art. 807. While correct that the court is only required to give a special instruction when "it does not

28

require qualification, limitation, or explanation," the language of La.Code Crim.P. art. 807 does not prohibit the giving of an instruction where the instruction is wholly correct but may require some qualification or explanation. It merely says the trial court is not required to give such instructions.

The jury instruction requested by the state was a wholly accurate statement of law and the defendant has failed to provide any legal support for the argument that if explanation is required, the court may not give such an instruction. Indeed, the defendant is essentially contesting the definition of the term "close proximity." While the term may be somewhat open to interpretation, it is no more obscure than the use of "imminent threat" with regard to a justification defense or the phrase "sudden passion" when charging a jury on a manslaughter charge. This assignment of error lacks merit.

## CONCLUSION

The defendant's convictions and sentences are affirmed. The trial court is ordered to correct the commitment ordered to accurately reflect the number of counts of which the defendant was convicted and for which he was sentenced.

**AFFIRMED;**
**REMANDED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.